UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Robert Johnson, </br></br>　　Plaintiff, </br></br>v. </br></br>Nancy A. Berryhill, Acting </br>Commissioner of Social Security,[1] </br></br>　　Defendant. | No. 17 CV 50058 </br>Magistrate Judge Iain D. Johnston |

**MEMORANDUM OPINION AND ORDER**

Many disability cases come to this court with a plethora of doctor notes, diagnostic tests, medical opinions, and other documents—all adding up to a voluminous pile. By contrast, this case presents a sparse record. The relevant evidence boils down to a couple of doctor visits, one MRI, and one EMG. Plaintiff has suffered from diabetes since 1996, but alleges that he recently began to experience foot numbness caused by diabetic neuropathy and back, knee, and ankle pain caused by degenerative disc disease.[2] He claims that he needs a cane to walk and could not stand or walk for six hours, as required for a job classified as light work. Under Social Security rules, if he cannot do light work, then he must be found disabled given his age (he is now 62) and work experience. The administrative law judge ("ALJ"), in a short decision, concluded that plaintiff's two impairments were not severe enough to survive the *de minimis* screening standard at Step Two. The ALJ concluded that all of plaintiff's examination findings were normal and that he made several inconsistent statements. Plaintiff argues that the ALJ reached these conclusions by cherrypicking from the record and by essentially playing doctor. Despite serious concerns

---

[1] Nancy A. Berryhill has been substituted for Carolyn W. Colvin. Fed. R. Civ. P. 25(d).
[2] He also has glaucoma, but there are no arguments raised about this condition.

1

about the ultimate viability of plaintiff's claim, this Court agrees that a remand is appropriate on the record before it.

## BACKGROUND

As even plaintiff admits, the medical record is thin with less than a 100 pages of medical treatment. There are two main sources of treatment records. One is the prison records from plaintiff's stay at Taylorville Correctional Center from October 2012 until May 2013. But neither the ALJ nor the parties have relied on these records for any significant argument.[3] The other source is the records from Crusader Community Health ("Crusader"), where plaintiff was treated after he was released from prison and up until the hearing in the fall of 2015.

At Crusader, plaintiff was treated by Dr. Larry Sy who, in 2014, ordered an EMG to assess plaintiff's complaints of bilateral lower extremity numbness. R. 343. The EMG was performed on August 18, 2014. The conclusions from this report are as follows:

1. There is electrophysiologic evidence of motor polyneuropathy of the bilateral lower extremities, predominantly axonal type.
2. There is also evidence of bilateral S1 radiculopathy as evidenced by bilateral absent H soleus response.
3. Needle EMG did not show any evidence of active denervation.
4. Clinical correlation recommended. Flexor digitorum brevis.

R. 344.

About nine months later, in May 2015, the next relevant treatment took place when plaintiff twice saw Dr. Terry Roth, a neurologist. The first visit was on May 26, 2015. In the "History of Present Illness" section, Dr. Roth wrote the following:

> Paresthesias 61 year old man with a history of IDDM going back 19 years, complains of numbness in his feet, leg pains in knees and ankles.[4] He also reports

---

[3] As plaintiff notes, these records "are not exactly easy to read in some parts." Dkt. #17 at 1.
[4] As discussed below, this sentence is critical to one of the ALJ's rationales. "Paresthesia" is an "abnormal usually nonpainful sensation (e.g., burning, pricking)," and "IDDM" is the abbreviation for "insulin-dependent *diabetes mellitus*, a term declared obsolete by the American Diabetes Association for Type 1 diabetes." *Stedman's Medical Dictionary*, 944, 1425 (28th ed. 2006).

low back pain, and pain into his legs at times in bed such that he has trouble moving.
He started a B vitamin today and denies any [history] of B12 deficiency. He reports a 'stroke' in the 70's but it may have been a right Bell's Palsy.
He had EMGs showing neuropathy and possible S1 root bilateral. He had dopplers showing good circulation in the lowers.[]

R. 332. In the "Physical Examination" section, Dr. Roth wrote that plaintiff's gait was "[w]ithin normal limits," but that he "complains of discomfort in knees/ankles"; that his motor strength was "5/5 Upper and Lower"; and that his reflexes were "Biceps: 1-2+, Triceps: 1-2+, Brachioradialis: 1-2+, Knees: 1+, Ankles: 1+." In the "Assessments" section, Dr. Roth wrote that plaintiff had diabetes with neuropathy, bilateral leg pain, and low back pain. To further assess plaintiff's conditions, Dr. Roth ordered a lumbar MRI.

The MRI was performed on June 4, 2015. Because the MRI is a key piece of evidence, along with the EMG, the Court will quote both the specific findings and conclusion:

> LUMBAR DISC LEVELS
> L1-L2: Minimal facet degenerative changes
> L2-L3: Bilateral facet degenerative changes with some mild bilateral lateral recess stenosis. Mild broad-based disc bulge with extension into the proximal neural foramina bilaterally. No central canal stenosis. Most notably at the L4-5 level with multilevel broad-based disc bulge is with neural foraminal proximal extension. Please see above dictation for further discussion.
> L3-L4: Broad-based disc bulge with tiny left paracentral component with extension into the neural foramina bilaterally and left greater than right mild central canal stenosis with canal dimensions of approximate 9 millimeters
> L4-L5: Left paracentral disk protrusion which does contact the traversing nerve root there is superimposed broad-based disc bulge with bilateral proximal neural foraminal extension bilateral facet degenerative changes
> L5-S1: Broad-based disc bulge with tiny central disc protrusion
>
> CONCLUSION: Multilevel degenerative changes as described

R. 340.

Plaintiff next visited Dr. Roth was on June 30, 2015. In the "History of Present Illness" section, Dr. Roth wrote the following:

3

> Radiculopathy [r]eturns at one month with no real change in his numbness and pain in the lowers. He had the lumbar MRI showing degenerative changes but not a major ruptured disc. He had lab work with an ESR=7 but his B12 was low normal and he has not started his vitamins. He reports taking gabapentin 300mg tid with benefit but he still has to take Ibuprofen. I discussed going up on gabapentin as it treats both diabetic neuropathy and lumbar root and is probably safer than daily ibuprofen. He will gradually go to 600 mg tid and try to cut back on pain med.

R. 328. Dr. Roth assessed plaintiff with diabetes with neuropathy and low back pain due to degenerative discs. A follow-up appointment was recommended for three months later. *Id.*

The hearing before the ALJ was held on October 28, 2015. No medical expert was called to testify. Plaintiff and a vocational expert testified. On February 24, 2016, the ALJ issued her six-page decision.

## DISCUSSION

Two broader observations should be noted before considering plaintiff's cherrypicking arguments. First, plaintiff complains that the ALJ prematurely ended this case at Step Two, thereby depriving him of a more detailed analysis that would have been undertaken if the five-step process had been completed. Basically, plaintiff argues that the ALJ employed an overly rigorous standard. This Court agrees. At Step Two, the ALJ must determine whether a claimant has one or more severe impairments. Somewhat contrary to the common connotation of the word "severe," in disability litigation at Step Two, the word has a more diluted meaning. As the Seventh Circuit has stated, the Step Two inquiry is only "a *de minimis* screening for groundless claims." *See Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016); SSR 85-28 ("Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued."). Here, given that both an EMG and an

MRI confirmed that plaintiff suffered from neuropathy and degenerative disc disease, this does not appear to be a groundless claim.

Second, in analyzing the objective evidence, the ALJ did not rely on any supporting medical opinion. The ALJ did not call a medical expert at the hearing. No consultative examination was ordered. It is true that there were two State agency opinions, which the ALJ nominally relied on, but neither doctor reviewed or commented on the EMG or MRI, and neither one acknowledged plaintiff's complaints of neuropathy. Without any supporting medical opinion, the ALJ was thus forced to play doctor, as discussed below.

Plaintiff argues that the ALJ mischaracterized or overlooked several facts favorable to his case. *See Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("the ALJ identified pieces of evidence in the record that supported her conclusion that Mr. Scrogham was not disabled, but she ignored related evidence that undermined her conclusion"). The overlooked facts are offered as a rebuttal to the ALJ's unqualified, all-or-nothing conclusion that "all" examination findings were "normal" and that there was a "complete absence" of any "remarkable examination findings." R. 24-25. Plaintiff relies on three facts.

First, plaintiff argues that Dr. Roth, in his physical examination, found that plaintiff had only "trace reflexes" in his ankles and knees, allegedly indicating that his strength was not intact. Dkt. #15 at 5. The Government does not dispute plaintiff's assertion that this was an abnormal finding, or that the ALJ failed to acknowledge it. Instead, the Government argues that this finding was outweighed by other normal findings from the same examination. *See* Dkt. #16 at 4 ("Indeed, although Dr. Roth observed that plaintiff had diminished reflexes, he also observed that plaintiff had normal strength[.]"). The Government may ultimately be right, but this argument runs afoul of the *Chenery* doctrine because the ALJ never explicitly engaged in this

weighing process. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). Moreover, even if the ALJ had done so, the ALJ would have then been playing doctor by determining which finding was more significant. *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJs should not "play doctor" by summarizing the results of a medical exam without input from an expert).

Second, with regard to the EMG, plaintiff argues that the ALJ omitted the finding that he had radiculopathy. The Government first argues that the ALJ "specifically noted" this fact in the decision, but the Court cannot find evidence that the ALJ did. *See* Dkt. #16 at 5. The Government then argues that, even if the EMG showed that plaintiff had radiculopathy, it also found no evidence of "active denervation." *Id.* Again, the Government seems to be offering an after-the-fact balancing analysis in which it argues that one medical finding trumped another finding. This Court has no way to judge the accuracy of this contention. The Government again may be proven correct, but without a supporting medical opinion, the argument is a layperson analysis.

Third, a similar criticism applies to the MRI. The ALJ did not discuss any of the specific MRI findings, which were quoted above, but generally concluded that the report indicated only "mild" problems. R. 24. But it is not clear whether "mild" is a fair characterization. The conclusion section of the report did not use this word. Instead, this section merely stated that there were "[m]ultilevel degenerative changes as described." It is true that the word "mild" was used once in the specific findings, but there were also many other findings that didn't include that qualifying adjective "mild," although they did not include "moderate" or "severe" either. One question then is whether some of the specific findings were more than just mild. Another question is whether multiple mild findings could cumulatively add up to a more-than-mild conclusion. The conclusion that there were "multilevel" changes perhaps supports such an idea.

This is another reason why a medical expert is needed to interpret these results. *See Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) ("The MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion.").

In addition to these three omissions, the ALJ's analysis left out the broader diagnoses and treatment recommendations made by plaintiff's doctors. Both Dr. Sy and Dr. Roth agreed that plaintiff was suffering from neuropathy and degenerative disc disease, and both agreed that plaintiff should take Gabapentin. Dr. Roth, in the last appointment before the hearing, recommended that the dosage be increased. Although the ALJ acknowledged these facts, the ALJ did not appear to give them any serious consideration when concluding that there was a "complete absence" of any abnormal findings. It would be helpful, on remand, if one of these two doctors could provide a formal opinion.

The Court turns now to the credibility analysis. The ALJ cited the complete lack of objective evidence as one reason for finding plaintiff not credible. But the heart of the analysis was the conclusion that plaintiff made a series of inconsistent statements. However, several of these conclusions rest on incomplete or ambiguous factual foundations. The Court will discuss three instances.

**Longstanding neuropathy.** The ALJ found it significant that plaintiff had neuropathy for "years" but was still able to work full-time during some of that period. The logic was simple but powerful. If he could work then with the same impairments, he could work now. This rationale was arguably the key one in the entire decision. Although the ALJ did not explicitly label it as such, the ALJ referred to it several times. The Government, in its response brief,

likewise referred to it as "important evidence," mentioning it prominently on the first page of the brief, as well as twice thereafter. Dkt. #16 at 1, 5-6, 9.

The concern is with the factual premise. The ALJ cited to only one piece of evidence. It was the following sentence taken from Dr. Roth's treatment notes: "Paresthesias 61 year old man with a history of IDDM going back 19 years, complains of numbness in his feet, leg pains in knees and ankles." R. 332. The ALJ construed this sentence to mean that the neuropathy or numbness (paresthesias) existed for 19 years. But another way to read this same sentence—one that this Court finds to be more reasonable and natural—is that plaintiff was merely reporting that he had diabetes (IDDM) for 19 years, and that the numbness was a more recent complaint. If true, then the ALJ's rationale collapses. At a minimum, the sentence is ambiguous. And, the ALJ did not cite to any other evidence to confirm that the neuropathy had been longstanding. The prison records apparently do not refer to it, nor did this Court find any other confirmation. Plaintiff argues that the neuropathy emerged only recently after many years of poorly controlled diabetes. On remand, the ALJ should develop a more solid factual foundation about when the neuropathy began, especially if relying on this rationale.

>**The cane.** As another alleged inconsistency, the ALJ noted the following:
>
>At the hearing, [plaintiff] testified that he had been using a cane for six months because of problems with his left leg. Notably, after the hearing, the claimant's representative submitted a prescription, dated *after* the hearing, for a cane by Dr. Sy[.] Dr. Sy did not provide any supporting explanation or diagnosis for the prescription.

R. 24 (emphasis in original). The Court is not clear why this was an inconsistency. The mere fact that plaintiff obtained a prescription after the hearing does not necessarily mean that plaintiff was lying. The doctor agreed to write the prescription, thus presumably reflecting his belief that plaintiff needed a cane. It is true, as the ALJ noted, that Dr. Sy did not provide an explanation.

But this is not a basis, standing alone, for doubting plaintiff. It would be helpful on remand if Dr. Sy could provide an explanation because the issue is important given that the vocational expert testified that the need to use a cane would preclude light work.

**Administering sister's medication.** Another alleged inconsistency was the following: "[Plaintiff] reported that he was responsible for administering medication to his aging sister. However, he simultaneously maintained that he required reminders to take his own medication[.]" R. 24. This argument, like the previous two, is based on a sliver of ambiguous evidence. The two allegedly contradicting statements were both made on the Adult Function Report completed by plaintiff. In response to a question asking what he does after waking up, plaintiff wrote that he would take his medication and then would "administer [his] aging [sister's] medication." R. 201. On the next page, in response to a separate question asking whether he ever "need[s] help or reminders taking medicine," plaintiff answered that he "sometime[s]" does before eating a meal. R. 202. The ALJ believed that these two statements—made one page apart—were inconsistent and thus evidence that plaintiff was not being truthful.

Based solely on these brief answers, it is not apparent to this Court that there was an inconsistency. One could imagine a situation in which plaintiff both reminded his sister to take her medication, but then sometimes forgot to take his own and had to be reminded to do so (perhaps by his sister or someone else). Such a mutual-reminder relationship is one that many elderly couples undoubtedly follow. This point aside, the ALJ also failed to acknowledge plaintiff's testimony that provided a richer picture about his living arrangement. At the hearing, plaintiff stated that he lived with his sister, who was 78, and that his sister's daughter, who was in her 50s, also lived with them. R. 35-36. The daughter worked during the day as a caretaker in a nursing home. In addition, there was a separate caretaker who looked after the sister because

she was disabled with dementia. Given that there were two caretakers involved with the sister's care, it seems unlikely that plaintiff was playing the key role in administering medication.[5]

In sum, this Court concludes that a remand is required so that the ALJ can complete all five steps of the analysis and can obtain a medical opinion. The Court recognizes that plaintiff has a limited treatment history, but finds that plaintiff has still raised sufficient grounds for a remand.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: June 1, 2018        By: _____
                              Iain D. Johnston
                              United States Magistrate Judge

---

[5] Additionally, as plaintiff notes, his alleged mental ability to remind his sister to take her medication is far afield from the question of whether he could do the physical tasks required for light or medium work.